# COURT OF APPEALS OF TEXAS.

## AUSTIN TERM, 1879.

### CHARLES HARRIS v. THE STATE.

1. SPECIAL VENIRE — JURY. — Of sixty persons named in a special *venire*, the sheriff found and served but thirty-five, and then, without authority, summoned twenty-five others to fill the *venire*, and returned their names with those served by virtue of the writ. In forming the jury, however, the court extruded the persons illegally summoned by the sheriff, and filled the panel partly from those summoned under the *venire* and partly from talesmen summoned by verbal order of the court. *Held*, that the jury was legally organized, and no right of defendant was prejudiced.

2. SAME — CHALLENGE TO THE ARRAY. — The Code of this State allows but one cause for challenge to the array, and that is, corrupt action of the officer in summoning persons prejudiced against the defendant.

3. JURY — PRACTICE. — Defendant is not entitled to service of a list of talesmen summoned to fill the panel after exhaustion of the special *venire*.

4. CONFESSIONS. — A prisoner, after his arrest on a charge of the murder of his brother, voluntarily handed to the officer a document, saying it contained his confession as to how the deceased was killed, and that he had written and wished to make it. The officer then duly cautioned the prisoner that such a statement could be used as evidence against him. The prisoner not only evinced no desire to get back the document, but verbally added that he would not have killed his brother if it had not been for their father. *Held*, that the document was competent evidence for the State. If, however, the prisoner, after being cautioned, had shown a desire to withdraw the document, it would not have been competent evidence.

5. EVIDENCE. — In a trial for murder, the State produced a memorandum-book, and proved that certain entries therein were in defendant's handwriting. The defence objected that there was no proof that the book had ever been in the defendant's possession, or that he had delivered it to the person from whom it had been obtained, and who was not produced as a witness in the case. *Held*, that the objections were untenable, and the entries correctly admitted as evidence.

6. CONTINUANCE — PRACTICE IN THIS COURT. — Refusal of a continuance will not be revised when no bill of exception to the ruling appears in the transcript.

Appeal from the District Court of Montague. Tried below before the Hon. J. A. Carroll.

This record discloses a trial and conviction for the rare and revolting crime of fratricide, instigated, as it appears, by the father of the assassin and his victim.

M. B. V. Shockley, for the State, testified that he knew the defendant, Charley Harris, and also John Harris, the defendant's brother, who, on the morning of January 17, 1878, was killed in Montague County, Texas, at the residence of the deceased, the defendant, and their father. Witness lived about two and a half miles distant, and saw the deceased about an hour and a half after the homicide. The wound which killed him appeared to have been made with a shot-gun, all of the shot, except one, having entered the left side, near the heart, and lodged on the right side, just beneath the skin. The wound was such as would inflict instant death. Witness did not see the defendant the day of the killing; and when he next saw him, he (the defendant) was in jail at Denison, on a charge of stealing a horse of Mr. Reed, who lived in the neighborhood where the killing took place. Witness knew Charles Harris, the father of the defendant and the deceased, and saw him at the scene of the homicide soon after it occurred. He remained in the neighborhood only a few days longer. It was ten or twelve days after the murder when witness saw the defendant in jail at Denison.

P. H. Thompkins, for the State, testified that he knew the defendant and the deceased, and gave the same description as the previous witness of the wound by which the latter came to his death. Prosecuting counsel showed to the witness a leaf from a blank-book, with writing on it, and witness recognized it as a paper found by himself and Dr. Gordon, in a path near the place where the killing was done. Witness did not know whose handwriting it was on

the paper, and was not acquainted with the defendant's handwriting.

A. L. Shoemaker, for the State, testified that he had often seen the defendant write, and was well acquainted with his handwriting. Being shown the paper identified by the witness Thompkins, this witness testified that the writing upon it was that of the defendant. The writing on the paper was then read in evidence, as follows : —

" To the Officers of this G — d dam County : When you come up with us, bring all of Texas, or you won't get what you started for, but get a good whipping.

"Charley Harris,

"D. & Company."

L. N. Perkins, for the State, testified that he was sheriff of Montague County, and had charge of the defendant ever since he was put in jail. Prosecuting counsel showed to the witness two documents marked " Exhibits B & C," and asked if he had ever seen them before ; to which inquiry the witness replied that he had. At this juncture the jury were removed, at the instance of the defence, and the prosecution proceeded, before the court, to lay the predicate for the introduction of the documents as evidence to the jury. The witness then stated that while he and Thomas Harkins had the defendant in custody, and were at a blacksmith shop for the purpose of having him ironed, the defendant produced certain papers and handed them to witness, telling him that they contained his confession as to how John Harris was killed, and that he wanted to make the statement, and had written it out. Witness then, and before he read the confession, told the defendant that any confession he made would be taken as evidence against him. Witness did not force, persuade, or influence the defendant to make the confession. The first he knew of it, the defendant handed it to him, and told him that he (the defendant) had written it, and that it was his statement about the matter. On cross-examination, the witness repeated that

as soon as the confession was handed him, and before he read it, he warned the defendant that any such statement or confession would be used against him at his trial. After thus warning the defendant, witness read the confession. Mr. Harkins then told the defendant that any statement made by him in regard to the killing of John Harris would be used as evidence against him; and then the defendant said that he would not have killed his brother if it had not been for his father. The court asked the witness whether the defendant, after being warned, requested that his confession be returned to him; to which the witness replied that the defendant did not so request, and showed no desire whatever to take back the written confession, but went on to make the verbal statement aforesaid. Witness repeated that the written statement was made voluntarily, and without persuasion.

Upon this predicate the prosecuting counsel proposed to read the documents " B " and " C " in evidence to the jury. The defence objected in general terms, without specifying causes of objection; and to the ruling of the court admitting the papers the defence reserved a bill of exceptions of the same general character as the objection. The papers were then read to the jury as evidence. After correcting numerous errors in the spelling and punctuation, they are in the following language:—

" *Charley Harris.*

" First, my father would come up to me and say that John was going to drive me off, and that he did not want me on the place; and he would say that John was afraid that I would steal some of his horses. And when I was picking cotton for Mr. Wells, he told me to quit and come home and help pick their cotton, so they could get off to Sherman, and he would tell me how to get John off in a way that nobody would suspicion; and my father said that if I didn't kill John, that John would me. And so, when we went to start to Sherman with the cotton, he gave me two dollars

for to get some arsenic; and so I did, and came back.   Next morning he told me to put the poison in the milk, and the poison was put there; but John would not drink the milk, and then my father told me that I had better go off and stay for a while, but be sure and come back; and I told my father that I had no money nor clothes, and he told me to get eight dollars and forty-five cents that Calvin Morrow owed me for picking cotton; but I had traded that off for a pair of boots to my brother John.   And he said that I could come back, and I could get plenty of clothes in the house there at home; and so I did as he told me.   He told me to be sure to come back.   So I went off to Denton County, and married, and came back in about four weeks.   I got up to Mr. Henley's on Sunday night.   Next day I went up to Mr. John Sims's, and stayed there till the 16th of the month, and came down to my father's house, and he was not at home; so I went over to Mr. Giles Gibson's and eat my dinner; and from there I went to Mr. Johnson's, and I tried to borrow a shot-gun, but did not get the gun.   And so from there I started down to Mr. Miller's for to borrow a shot-gun, but before I got there I saw my father starting from Mr. Anderson's, and I caught up with him, and he told me that John was gone down to Mr. Hawkins's, near Gainesville, after the rest of his clothes, and that I ought not to have brought them up.   And he said that John would be back that night, and that John would kill me if he saw me, and I better be careful, — that John would kill me.   He told me to go and get his shot-gun, it was in the house, and that he would go on up to Mr. Hale's; and for me to be careful, — that John might be up there at the house.   But he was not, and so I got the gun.   And father said for me to make out like I was going off, — and so I did, — but to come back that night and kill John while he was feeding his horses.   And I came back, but did not get a chance that night, until next morning, for there was somebody there that night.   And I stayed near the house until next morning; and he said for me to come

back the next night, and he would get me some money and a horse to get off, until he sold all of his property, and then we would go leave the country. I came back the next night, but my father was not there at the place ; and my father had told me not to take one of John's horses, for it would look like he was implicated in it, — that there was some horses in the country close by that I could get, and get off on ; but he said for me to stay by close to Gainesville, and come up to Mr. Hawkins's in about two weeks, and he would be there, and then we would go off.

"No more at present,

"CHARLEY HARRIS."

" My father had often told me that John's intention was to drive me off and kill him, so as to get all of his property, and that John was going to get rid of [us?] in some way ; and I would ask my father why John had any cause for it, and he said that John had threatened to take all he had and leave. And before, me and my brother never had but one fuss, and father was the cause of it. And my father often told me that he would sell the property afterwards, and we would go off. So my father told me to write in my day-book the cause that it was done, and drop it close to the house, so somebody could get the book, and be sure to not say any thing about him, so as he could get off. Constable Spence has got the book in Denison.

"CHARLEY HARRIS, ESQ."

H. N. Richards, for the State, being shown a memorandum-book, recognized it as one which he got out of the post-office at the town of Montague. It was directed to the sheriff of Montague County, and witness was a deputy-sheriff, and took the book out of the post-office and delivered it to the county attorney. It was post-marked Denison, Texas, February 5, 1878, and was sent to the sheriff by one Spence, a constable at Denison ; but witness did not know how Spence obtained possession of it.

A. L. Shoemaker, for the State, again testified to his

knowledge of the defendant's handwriting; and being shown the entries on certain pages of the memorandum-book, stated that they were in the handwriting of the defendant.

The State then proposed to read the entries to the jury; to which the defence objected, because there was no proof that the book had ever been in the defendant's possession, or had ever been delivered by him to Spence or any one else, and because the State had not produced Spence as a witness to show from whom he had obtained the book. These objections being overruled, the defence reserved exceptions, and the State introduced the entries; which, corrected in spelling, are as follows: —

" Publish this in the paper, gentleman and ladies. I killed my brother, or tried, just because he talked the way he did, and I got a darling little wife to mourn after me when I am gone. But shed not a tear o'er your husband's early bier, when he is gone. For she is all the world to me; I love my darling Josie better than I do my life, and I hope to meet her in heaven, if not in this world. I hope God will protect my wife and keep her from all harm. I hate to part from Josie, but it must be. Poetry by C. H.: I have a darling little wife, perhaps sisters three; likewise my aged father, he shed his tears for me. Farewell to all on earth, but hope to meet you in heaven.

" CHARLEY HARRIS, JR."

" Josie, this is true: if John and I meet, one of us must die, for his talk about me is too hard for me to take. And, Josie, I am going off, but I will send some money to St. Joe, on the 4th day of July, for you to come; and, Josie, you must come. I will tell you where to come first, by letter, but I will back it to John Sims; and when you write to me, direct your letters to Franklin Pemberton. But I will write first, and tell you where I am at. So, Josie, I will send you the money to St. Joe. And bring all of your things with you."

R. Cook, for the State, testified that the defendant, after his arrest upon the charge of the murder of John Harris, was brought before witness, who was a justice of the peace. Defendant waived examination, and witness committed him to jail. While in arrest, but after being warned by witness that any statement he should make about the killing would be evidence against him, he freely and voluntarily stated to witness that his father had put him up to kill his brother John; that his father, some time previous, gave him a dollar and a half to go either to St. Joe or Sherman and purchase some arsenic; that he bought the poison, took it home, and put it in the milk, but John did not drink it; that he then went off and came back, and, by persuasion of his father, killed John with a shot-gun. This, said the witness, was the substance of the statement made to him by the defendant.

Several witnesses for the State testified to the movements of the defendant in the neighborhood for some days prior to the murder, and to his efforts to borrow a shot-gun. Their testimony coincided with the defendant's written confessions delivered to Sheriff Perkins. J. Johnson, one of these witnesses, testified that the defendant was at his house the evening before the killing, and tried to borrow a shot-gun, but did not get it. Defendant told witness that he wanted a shot-gun to kill John Harris with, — that if John did not put some clothes back where he got them, he would kill him before the sun set, or by the time it rose again. Mrs. Johnson also testified to the same effect. It was in proof that, within a few days after the murder, Charles Harris, Sr., the father of the defendant and deceased, sold his effects and left the country. The record does not disclose any distinct or adequate cause for the unnatural enmity of the defendant and his father towards the deceased.

The defence introduced John Evans, who testified that he lived within sight of the residence of the deceased and his

father and brother. Between daylight and sunrise on the morning of the killing, witness heard a report like that of a shot-gun, in the direction of the house occupied by them; and, looking in that direction, witness saw some one running, half bent, about thirty or forty yards from the house, and heard the report of three pistol-shots. Hearing old man Harris hallooing and taking on, witness immediately went over there, and found John Harris lying in the house, dead, having been shot through with a shot-gun. All the balls appeared to have entered on the left side, near the heart, and to have lodged under the skin on the opposite side. Some one in the house had a pistol, which witness knew was the pistol of John Harris. Three fresh loads had been shot out of it. Witness had seen the pistol there two or three days previous. Old man Harris was at the house when witness got there. This was the only evidence adduced by the defence.

The jury found the accused guilty of murder in the first degree. Motions for a new trial and in arrest of judgment were made, and overruled. The opinion of this court discloses the material questions arising upon the entire record.

No brief for the appellant.

*W. B. Dunham*, Assistant Attorney-General, for the State, filed an able brief.

ECTOR, P. J. The defendant in this case was indicted, in the District Court of Montague County, for the murder of John Harris. He was tried at the October term, 1878, of said court, convicted of murder in the first degree, and has prosecuted his appeal to this court. No objection was raised in the court below to the sufficiency of the indictment. The indictment is a good one, has all the requisites prescribed by the statute, and follows the common-law precedents of an indictment for murder.

The first question which we propose to consider is presented in defendant's first bill of exceptions. A writ of special *venire facias* was duly issued by the district clerk of Montague County, to which were attached the names of sixty persons to be summoned by the sheriff, from whom the jury for the trial of this cause was to be selected. Said writ of special *venire facias* was delivered by the clerk to the sheriff of Montague County. There is no objection to the manner in which the names on said list were obtained. After both parties had announced ready for trial, and the defendant had been duly arraigned and pleaded not guilty to the indictments, and five jurymen had been empanelled in the case, the defendant, as stated in his bill of exceptions tendered to the court, then for the first time ascertained that of the sixty persons whose names were on the special *venire* but thirty-five were found and summoned by the sheriff, and that the sheriff, on his own motion, summoned twenty-five additional persons to complete the *venire*, whose names are stated by him in his return on said writ. The defendant therefore challenged the array, and moved the court to set aside said *venire*, which motion the court overruled; to which ruling the defendant then and there duly excepted, because, "1st, the sheriff erred in serving said twenty-five additional jurymen on his own motion; 2d, said sheriff had no authority to summon said twenty-five additional jurymen, and the court erred in requiring the defendant to proceed with the trial of the cause with said illegal jurymen then empanelled, and to pass on the remainder of said illegal panel."

The court, before signing this bill of exceptions, added to it the following qualification: "After the case had proceeded to trial, and five jurors had been empanelled and sworn in the case, the defendant's counsel stated that all the jurors drawn upon the special *venire* by the clerk had not been summoned by the sheriff, and that the sheriff had summoned other persons to complete the number sum-

moned to sixty; and the defendant, by counsel, therefore
challenged the array for that reason. The court overruled
the motion, but informed the counsel, at the time, that when
any individual juror's name was called who was so sum-
moned by the sheriff, and whose name was not found upon
the list attached by the clerk to the special *venire*, a
challenge would be sustained; and after all the names
found upon said list so drawn by the clerk had been called,
the defendant's counsel challenged the remainder; which
challenge was sustained by the court, and the jury was
completed from jurors afterwards summoned by the sheriff
by order of the court."

We believe that all the rights of the defendant were fully
secured by these orders and rulings of the court. The de-
fendant was not required to select from those illegally sum-
moned by the sheriff on his own motion, and the jury was
formed just as though the irregularity had not been com-
mitted.

But one cause, under our statute, is allowed as a challenge
to the array. Art. 3034, Paschal's Digest, is as follows:
" The defendant may challenge the array for the following
cause only: that the officer summoning the jury has acted
corruptly, and has wilfully summoned persons upon the
jury known to be prejudiced against defendant, and with a
view to cause him to be convicted." *Swofford* v. *The
State*, 3 Texas Ct. App. 88; *Williams* v. *The State*, 44
Texas, 34.

The points raised in defendant's second bill of exceptions
are not well taken. After the *venire* had been exhausted,
and only five jurors empanelled, the court verbally ordered
the sheriff to go beyond the court-house yard and sum-
mon thirty additional jurymen, legally qualified for the trial
of this cause, and to report their names to the clerk; which
the sheriff proceeded to do. The clerk gave the county
attorney and the counsel for the defendant a list of the
names of the thirty jurors summoned by the sheriff upon

the verbal order of the court, and the court ordered counsel to proceed and complete the organization of the jury from said list.    To which the appellant excepted, for the following reasons, to wit: —

" 1. That there was no special *venire facias* issued to complete the jury in said cause, and that the sheriff proceeded to summon said persons on the verbal order of the court alone.

" 2. That there was no oath administered to the sheriff or person summoning said jurors, as the law requires ; and that neither defendant nor his counsel knew who did summon said jurors, as there was no written return made to the court showing the manner of summoning said jurors, nor by whom they were summoned.

" 3. That defendant requested the court to give him one day's notice of the thirty jurors summoned as last aforesaid ; which the court refused to do."

The judge who presided at the trial signed the bill of exceptions, with this qualification, to wit : " That, upon the beginning of the term, the court in open court administered to the sheriff and his deputy the oath prescribed by sect. 12 of the jury law of 1876, and the jury was summoned by no person but the sheriff and his deputy so sworn."

The talesmen were summoned in the manner prescribed by statute.    Gen. Laws Texas 1876, p. 82, sect. 23.    See also art. 3030, Pasc. Dig.

The defendant was not entitled to have a list of the talesmen served on him.    *Johnson* v. *The State*, 4 Texas Ct. App. 268.

The qualification added to the bill of exceptions by the court shows that the officers by whom the jury were summoned were sworn in the proper manner.    Gen. Laws 1876, p. 80, sect. 12.

The evidence shows that John Harris was murdered in the county of Montague, on the morning of the 17th of January, 1878 ; that he came to his death from a gunshot

wound, which appears to have been made with a shot-gun, — the shot, all but one, entering his body at the same place, on the left side, near the heart, and lodging on the right side, just under the skin.    He was killed at the house where he and his father and the defendant lived.

The next question raised by defendant, and set out in his third bill of exceptions, relates particularly to the ruling of the court in admitting in evidence what is styled the written confession of defendant, a copy of which is attached to said bill of exceptions, marked "Exhibits B & C."    The county attorney introduced Lee N. Perkins, sheriff of Montague County, as a witness in behalf of the State; handed him said exhibits "B" and "C," and asked him if he had ever seen those papers before; to which question he (the witness) answered that he had seen them before.    The witness Perkins then stated that he and Thomas Harkins had the defendant, Charley Harris, under arrest, and were at the shop waiting to have the prisoner ironed; that the defendant had the papers in his possession, and handed them to witness, and told witness they contained his confession as to how John Harris was killed, and that he wanted to make the statement, and that he had written it out; that witness then told him that any confession he would make would be used as evidence against him; that he never persuaded defendant to make the statement, nor did he force defendant to make it, nor use any influence to induce him to make the confession; that the first he knew of it, the defendant handed the statement to him, and told him he had written it out, and that it was his (defendant's) statement about the matter; that, as soon as defendant handed witness the confession and told him what it was, he then warned defendant that any such statement or confession would be used against him; that after he had warned the defendant, he read the confession, over; that Mr. Harkins then told the defendant that any statement made by him in regard to the killing of John Harris would be taken as evidence

against him; and that the defendant then said that he would not have killed his brother John if it had not been for his father. The court then asked the witness whether or not the defendant asked for the confession to be returned to him, after he had been warned that it would be used as evidence against him; and that the witness answered that he did not, and that defendant showed no desire whatever to take back the written statement, but went on and made a verbal statement, in addition to his written statement, after being warned that it would be used against him; that he made the statement voluntarily, and without any persuasion whatever. Whereupon the county attorney proposed to read said confession in evidence, which the court permitted him to do; to which the defendant then and there objected, which objections were overruled by the court, to which ruling the defendant excepted, and took a bill of exceptions.

We do not think the court committed an error in allowing the county attorney to read said written confession. It is evident that the exhibits "B" and "C" had been prepared before they were handed to the witness by the defendant. If the defendant, after he was cautioned that any statements made by him in regard to the killing of John Harris would be used in evidence against him, had shown any desire to get back the written confession, or to have the papers, exhibits "B" and "C," returned to him by the witness, then the objections to the admission of this evidence would have been well taken. On the contrary, after being so cautioned, he proceeded to make a verbal statement to the witness about the killing of his brother.

No objection was taken in the court below to the confessions of defendant made to the witness R. Cook, as testified to by him. The evidence was properly admitted. His confessions to Cook were freely and voluntarily made, without compulsion or persuasion, after having been first cautioned by Cook that they could be used against him.

The court did not err in permitting certain entries in the memorandum-book, described in the fourth bill of exceptions, to be read in evidence, after the entries were proved to be in the handwriting of defendant by the witness Shoemaker, who had first testified that he was acquainted with the handwriting of the defendant, Charley Harris, and that he had seen him write, and he knew his handwriting.

One of the grounds set out in the motion for new trial is, that the court erred in overruling the defendant's application for continuance. We find no such application copied into the transcript, and no bill of exceptions taken to the ruling of the court on such an application. The action of the court in overruling an application for continuance will be considered only, on appeal, in a bill of exceptions taken at the trial, and embodied in the transcript sent up to this court on appeal. *Nelson* v. *The State,* 1 Texas Ct. App. 41 ; *Grant* v. *The State,* 2 Texas Ct. App. 1 ; *Allen* v. *The State,* 4 Texas Ct. App. 581.

The charge of the court was a clear and correct enunciation of the law applicable to the case. No exception was taken to it, and no additional instruction was asked.

It would be a useless consumption of time to comment upon the facts, for the purpose of showing that the verdict of the jury is sustained by the evidence. The evidence proves beyond a reasonable doubt that the defendant murdered his brother, John Harris, and the external facts and circumstances having connection with and relation to the killing furnish satisfactory evidence of the existence of a sedate, deliberate mind on the part of the defendant at the time he committed the act, and that the killing was the result of a formed design to take the life of the person slain.

We have given to the questions in the record now before us a most careful and patient consideration. The defendant has not been represented by counsel in this court. In view of the momentous issues involved, we have examined the

entire transcript with the most rigid scrutiny, but find no error to justify the reversal of the judgment. Believing that the defendant has had a fair and impartial trial, and been legally convicted, the judgment of the District Court is affirmed.

*Affirmed.*